IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

LENORA PERRINE, CAROLYN HOLBERT,
WAUNONA MESSINGER, REBECCAH MORLOCK,
ANTHONY BEEZEL, MARY ELLEN MONTGOMERY,
MARY LUZADER, and TRUMAN R. DESIST,
individuals residing in West Virginia
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

v.                            CIVIL ACTION NO. 1:04CV212
                                    (Judge Keeley)

E. I. DU PONT DE NEMOURS AND COMPANY,
a Delaware corporation doing business
in West Virginia, MEADOWBROOK
CORPORATION, a dissolved West Virginia
corporation, MATTHEISSEN & HEGELER ZINC
COMPANY, INC., a dissolved Illinois
corporation formerly doing business in
West Virginia, NUZUM TRUCKING COMPANY,
a West Virginia corporation, T. L.
DIAMOND & COMPANY, INC., a New York
corporation doing business in West
Virginia, and JOSEPH PAUSHEL, an
individual residing in West Virginia,

        Defendants.

**MEMORANDUM OPINION AND ORDER REMANDING CASE**

    Before the Court is the plaintiffs' motion to remand, which is fully briefed and ripe for review. As elaborated below, the Court finds that defendant E.I. DuPont De Nemours and Company fails to establish the propriety of removal based upon federal officer jurisdiction. 28 U.S.C. § 1442(a)(1). Thus, the Court **GRANTS** the plaintiffs' motion to remand.

**PERRINE v. DuPONT**  1:04CV212

## MEMORANDUM OPINION AND ORDER REMANDING CASE

### I. PROCEDURAL HISTORY

On August 27, 2004, the plaintiffs filed this putative class action suit in the Circuit Court of Harrison County, West Virginia. Their First Amended Class Action Complaint (the "Complaint") asserts claims against E.I. du Pont de Nemours and Company ("DuPont"), Meadowbrook Corporation, Mattheissen & Hegeler Zinc Co., Inc., Nuzum Trucking Co., T.L. Diamond Co., Inc. and Joseph Paushel. In essence, the Complaint alleges that the defendants negligently disposed of hazardous materials generated by the zinc smelting facility in Spelter, West Virginia (the "Spelter facility") from 1910 until the facility's closure in 2001.

On September 27, 2004, DuPont timely removed the case to this Court pursuant to 28 U.S.C. 1442(a)(1), invoking federal officer jurisdiction. On October 26, 2004, the plaintiffs filed a motion to remand. By Order entered on November 16, 2004, the Court set a briefing schedule for this motion and a due date for exchange of initial disclosures, but otherwise suspended further discovery in the case.

### II. BACKGROUND

**A. Basis of the Suit**

The purported class of plaintiffs includes past and present residents of the communities in Harrison County situated near the

<u>**MEMORANDUM OPINION AND ORDER REMANDING CASE**</u>

Spelter facility. According to their Complaint, "millions of tons of waste materials" generated by the Spelter facility were placed in "a huge pile at the facility" adjacent to the West Fork River. The plaintiffs assert that the waste pile contains substantial quantities of hazardous substances, including arsenic, lead and cadmium. The hazardous substances allegedly released into the air during dry periods and when the pile occasionally caught fire. These substances also allegedly seeped into the ground, contaminating the West Fork River and other watersheds.

The Complaint avers that DuPont and the other defendants were responsible for the generation and management of the waste materials, which they allegedly knew could release hazardous substances in the surrounding area. The defendants allegedly failed, however, to either prevent such exposure or remediate any subsequent contamination. The plaintiffs claim that this purported negligence caused damage to their property and increased their risk of acquiring disease.

**B.    DuPont's Relationship with the Government**

DuPont owned and operated the Spelter facility from 1928 until it sold the plant in 1950.[1] During World War II (1941-1945), the

---

[1] DuPont reacquired sole ownership of the Spelter facility in 2001 and is the current owner of the facility site.

principal product of the Spelter facility, zinc, became vitally important to the United States government (the "Government"). Zinc was necessary to galvanize metal equipment and produce the brass shell casings in rifle and artillery ammunition. Thus, the production and procurement of zinc was critical to the war effort.

Faced with insufficient supplies of zinc, the War Production Board[2] issued General Preference Order M-11 ("Order M-11") on June 10, 1941 in order to conserve the supply and control the distribution of zinc. Order M-11 specifically required producers to set aside gradually increasing quantities of zinc for the national defense. By May 1, 1942, producers were ordered to set aside "[a]n amount equal to 75% of [their] January 1942 production of High Grade and/or Special High Grade Zinc, and 50% of [their] January 1942 production of all other grades of zinc." Supplementary Order No. M-11-k (May 1, 1942), at DuPont Opp. to Mot. to Remand, Ex. B2.

---

[2] The War Production Board, "the point agency during World War II, was authorized through Executive Orders to '[f]ormulate and execute in the public interest all measures needful and appropriate in order . . . to increase, accelerate, and regulate the production and supply of materials . . . required for the national defense.'" FMC Corp. v. U.S. Dep't of Commerce, 29 F.3d 833, 852 (3d Cir. 1994) (quoting FMC Corp. v. United States Dep't of Commerce, 786 F.Supp. 471, 474 (E.D. Pa.1992)) (internal quotations omitted).

Order M-11 also restricted the disposal and removal of "zinc scrap" without the "specific authorization" of the War Production Board. General Preference Order M-11 § 937.1 (as amended June 7, 1943), at DuPont Opp. to Mot. to Remand, Ex. B4. Order M-11 defined "zinc scrap" as "all materials or products the principal content of which, by weight, is zinc, which materials or products are the waste or by-products of fabrication or have been discarded on account of obsolescence, failure or other reason." Id. § 937.1(b)(2). All persons were prohibited from shipping or delivering "any zinc scrap except to a scrap dealer or to a producer or manufacturer of redistilled zinc, remelt zinc, brass, zinc dust, zinc oxide, chemicals or salts, unless he obtain[ed] the specific authorization of the War Production Board to do otherwise." Id. § 937.1(f). Order M-11 imposed criminal sanctions on anyone who violated its provisions. Id. § 937.1(k).

As levels of zinc production declined in 1942, the Government began to import raw materials from foreign sources. Consequently, the Metal Reserves Company, a Government-owned corporation, entered into an Agency Agreement with DuPont for the smelting and refining of zinc ores and concentrates from Mexico. (AA-118 Executed Contract, at DuPont Opp. to Mot. to Remand, Ex. F.) Under the Agency Agreement, DuPont purchased the zinc as an agent of the

## MEMORANDUM OPINION AND ORDER REMANDING CASE

Metal Reserves Company, processed the zinc at the Spelter facility, and delivered the final product to the Metal Reserves Company. The Agency Agreement established purchasing and delivery procedures, pricing, recordkeeping requirements, and material specifications. It also enumerated certain labor standards under 41 U.S.C. §§ 35-45 (1942), including minimal wage levels, length of the work day, workplace conditions, and other conditions of employment at the Spelter facility.

Although the Government owned the zinc at every stage, it did not lay claim to the by-products of the zinc processing. Paragraph 5 of the Agency Agreement states:

> Your Company [i.e., DuPont] agrees to receive, smelt and/or refine the ores and concentrates [bought in Mexico], and to deliver to this Company [i.e., the Metal Reserves Company], within four months of receipt thereof or an equal quantity in the form of slab zinc. [DuPont] will be entitled to all by-products contained in the ores and concentrates, and will pay or credit to [the Metal Reserves Company] at the time of final settlement hereunder 1.5¢ per pound of lead contained in the ores and concentrates in excess of 1½% by wet assay.

(Id.)

During the war years, DuPont entered into other contracts with the Government for the importation and processing of zinc. DuPont ultimately processed many thousands of tons of zinc for the Government.

**MEMORANDUM OPINION AND ORDER REMANDING CASE**

### III. STANDARD OF LAW

For purposes of a motion to remand, "[t]he burden of demonstrating jurisdiction resides with 'the party seeking removal.'" Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 816 (4th Cir. 2004) (quoting Mulcahey v. Columbia Organic Chems. Co., 29 F.3d 148, 151 (4th Cir. 1994)). Removal jurisdiction must be construed "strictly because of the 'significant federalism concerns' implicated. Therefore, '[i]f federal jurisdiction is doubtful, a remand [to state court] is necessary.'" Id. (quotations omitted) (alterations in original).

In the case at bar, the defendants assert that removal is proper under federal officer jurisdiction. See 28 U.S.C. § 1442(a)(1). This unique jurisdictional basis

> provides a statutory exception to the well-pleaded complaint rule[,] allowing "any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office" to remove an action by raising a "colorable federal defense" in his removal petition.

Virden v. Altria Group, Inc., 304 F. Supp. 2d 832, 843 (N.D. W. Va. 2004) (quoting 28 U.S.C. § 1442(a)(1) and citing Jamison v. Wiley, 14 F.3d 222, 239 (4th Cir. 1994)).

"[T]he right of removal conferred by § 1442(a)(1) is to be broadly construed." Kolibash v. Comm. on Legal Ethics of W. Va.

Bar, 872 F.2d 571, 576 (4th Cir. 1989) (citations omitted). However, private actors seeking protection under § 1442(a)(1) "bear a special burden of establishing the official nature of their activities" because federal officer jurisdiction "is premised on the protection of <u>federal</u> activity and an anachronistic mistrust of state courts' ability to protect and enforce <u>federal</u> interests and immunities from suit." <u>Freiberg v. Swinerton & Walberg Prop. Servs., Inc.</u>, 245 F. Supp. 2d 1144, 1150 (D. Colo. 2002) (citing <u>Ryan v. Dow Chem. Co.</u>, 781 F. Supp. 934, 950-51 (E.D.N.Y. 1992)).

## IV. ANALYSIS

Under 28 U.S.C. § 1442(a)(1), a civil action filed in state court may be removed by defendants who "acted under" an officer of the United States and have been sued "for any act under color of such office."[3] Accordingly, to invoke "federal officer" status under § 1442(a)(1), DuPont must: "'(1) demonstrate that it acted under the direction of a federal officer, (2) raise a federal defense to plaintiffs' claims and (3) demonstrate a causal nexus between plaintiffs' claims and acts it performed under color of federal office." <u>Pack v. AC & S, Inc.</u>, 838 F. Supp. 1099, 1101 (D. Md. 1993) (citing <u>Mesa v. Cal.</u>, 489 U.S. 121, 124-25, 129-31, 134-

---

[3] The parties do not dispute that DuPont is a "person" for purposes of § 1442(a)(1).

35 (1989)).

## A. Acting Under Direction of Federal Officer

"Removal by a 'person acting under' a federal officer must be predicated upon a showing that the acts that form the basis for the state civil or criminal suit were performed pursuant to an officer's direct orders or to comprehensive and detailed regulations." Virden, 304 F. Supp. 2d at 844 (quoting Ryan, 781 F. Supp. at 947). "It is not enough to prove only that 'the relevant acts occurred under the general auspices of a federal office or officer' or that 'a corporation participates in regulated industry.'" Freiberg, 245 F. Supp. 2d at 1152 (quoting Ryan, 781 F. Supp. at 947). Thus, in evaluating this prong of the federal officer jurisdiction analysis, a court must focus on the level of government involvement with the allegedly injurious actions and the contractors' discretion in performing such actions. See Virden, 304 F. Supp. 2d at 845; Pack, 838 F. Supp. at 1103; see also Bahrs v. Hughes Aircraft Co., 795 F. Supp. 965, 969 (D. Ariz. 1992) ("The critical analysis is 'to what extent defendants acted under federal direction' at the time they were engaged in conduct now being sued upon.") (quoting Gurda Farms, Inc. v. Monroe County Legal Assistance Corp., 358 F. Supp. 841, 844 (S.D.N.Y. 1973)).

As an initial matter, the Court must identify the alleged

misconduct that forms the basis of this suit.  Citing the first paragraph of the Complaint, DuPont argues that the plaintiffs' causes of action arise from the general operations of the Spelter facility.  This characterization, however, unreasonably broadens the scope of the plaintiffs' claims.  The Complaint clearly and repeatedly avers that the plaintiffs were harmed by the defendants' management and disposal of the hazardous waste materials produced by the Spelter facility.  (<u>See, e.g.</u>, Compl. ¶ 45) ("The principal issue in this matter involves the Defendants' conduct in disposing and releasing hazardous substances into the environment, which impacts members of the class.").  Conversely, the Court is unaware of any claim alleging that DuPont caused harm by merely processing zinc at the Spelter facility.  Thus, the Court finds that the conduct forming the basis of this suit is the management and disposal of waste materials around the Spelter facility.

The Court next must consider the extent to which the Government controlled the hazardous waste disposal.[4]  "To establish that it was 'acting under' a federal officer, [DuPont] must show a causal nexus between the conduct charged in [the Complaint] and the acts [it] performed . . . at the direction of official federal

---

[4] In its opposition to the motion to remand, DuPont grossly mischaracterizes this issue as whether the Government specifically directed the contamination of the area around the Spelter facility.

**PERRINE v. DuPONT**                                          **1:04CV212**

**MEMORANDUM OPINION AND ORDER REMANDING CASE**

authority." <u>Arness v. Boeing N. Am., Inc.</u>, 997 F. Supp. 1268, 1273 (C.D. Cal. 1998) (citing <u>Willingham v. Morgan</u>, 395 U.S. 402, 409 (1969)). As such, DuPont must prove "that the particular conduct being sued upon is closely linked to detailed and specific regulations." <u>Virden</u>, 304 F. Supp. 2d at 844 (quoting <u>In re Wireless Telephone Radio Frequency Emissions Products Liability Litigation</u>, 216 F. Supp. 2d 474, 500 (D. Md. 2002)) (other citation omitted).

In the case at bar, DuPont maintains that the Government owned all the by-products of the zinc processing and controlled the disposal of those by-products. The Agency Agreement, however, shows that <u>DuPont</u> owned the by-products of the zinc smelting. (AA-118 Executed Contract, ¶ 5, at DuPont Opp. to Mot. to Remand, Ex. F.) Moreover, Order M-11 only regulated the delivery of potentially recyclable zinc scrap,[5] not the disposal of hazardous waste by-products of zinc processing. General Preference Order M-11 § 937.1(f) (as amended Feb. 9, 1943). Therefore, the Agency Agreement and Order M-11 did not address, much less dictate, the management of waste materials that allegedly harmed the plaintiffs.

---

[5] "Zinc scrap," by definition, is primarily comprised of zinc. General Preference Order M-11 § 937.1(b)(2) (Feb. 9, 1943). Accordingly, Order M-11 restricted the delivery of zinc scrap because of its salvageable worth--unlike the waste materials at issue in this case.

**PERRINE v. DuPONT**  1:04CV212

MEMORANDUM OPINION AND ORDER REMANDING CASE

DuPont also argues that Order M-11, the Agency Agreement, and advisory committee memoranda demonstrate the Government's extensive control over the operations of the Spelter facility, including waste disposal. This evidence confirms that the Government substantially controlled the level of zinc production, shipment details, material specifications, and certain labor standards at the Spelter facility. Nonetheless, the Agency Agreement and the relevant regulations did not restrict or control waste disposal.

The advisory committee memoranda, in particular, are minimally probative on the issue of waste disposal at smelting facilities. The Zinc Labor Advisory Committee meeting summary, dated April 23, 1945, primarily concerned employee shortages and work conditions, and contains no mention of waste disposal at zinc processing plants. (DuPont Opp. to Mot. to Remand, Ex. J.) The Summary of the Sodium Hydrosulfite Manufacturers Industry Advisory Committee meeting, dated July 27, 1943, predictably reflects the concerns of sodium hydrosulfite manufacturers, as opposed to zinc manufacturers. (DuPont Opp. to Mot. to Remand, Ex. K.) Moreover, insofar as that summary relates to this case, it lends no support for DuPont's position. In the memorandum, committee members bemoan the growing problem of waste sludge disposal and its detrimental effect on zinc production. During this meeting, one committee

member suggested that "[i]ndustry should continue to explore possible outlets for [disposing zinc sludge]." (Id.) (emphasis added). Obviously, such a comment belies the assertion that the federal government determined how and where zinc sludge would be stored.

In light of this evidence, the plaintiffs argue that the case at bar is closely analogous to Arness v. Boeing North America, Inc., 997 F. Supp. 1268 (C.D. Cal. 1998). In Arness, the plaintiffs asserted state law claims against Boeing and other defendants for the alleged harm caused by the release and disposal of trichloroethylene ("TCE") and other toxic chemicals. Id. at 1270. Boeing used these chemicals in the process of testing, developing and researching rocket engines pursuant to contracts with the United States government. Id. In fact, the defendants were specifically required to use TCE in the manufacturing and test operations of rocket engines. Id. Moreover, agents from NASA, the Air Force, and the Department of Defense oversaw the defendants' work and had authority to stop the use of TCE. Id.

Notwithstanding Boeing's contractual obligation to use TCE, the Arness court emphasized that the plaintiffs' lawsuit was "premised on [Boeing's] disposal of TCE, not its use of TCE." Id. at 1273, 1274-75. The court further found that the government's

contract did not require disposal of TCE "in a particular manner," id. at 1274, and "did not specify that [Boeing] take safeguards to prevent the release of TCE." Id. at 1275. Thus, the court held that Boeing "was not acting under federal direction when it allegedly released the TCE. Rather, the acts relevant to Plaintiffs' suit occurred only 'under the general auspices of a federal officer.'" Id. (quotation omitted).

The Court agrees that Arness is directly on point. The claims in this case focus on the disposal, not the generation, of hazardous waste materials. As noted above, the Government did not restrict the manner or location of zinc sludge disposal. Indeed, DuPont offers no evidence suggesting that it managed waste disposal at the Spelter facility any differently during World War II than during its other years of ownership. Thus, the Court finds that DuPont fails to establish a sufficient causal nexus between the Government's commandeering of zinc during the war years and the disposal of waste materials around the Spelter facility. Accordingly, the Court finds that DuPont did not act under the direction of a federal officer when it performed the allegedly harmful conduct.

B.  **Colorable Federal Defense**

The parties vigorously dispute whether DuPont asserts a colorable federal defense. "[F]ederal officer removal must be

predicated on the allegation of a colorable federal defense." Mesa, 489 U.S. at 129. In light of DuPont's failure to establish that it disposed of waste materials under the direction of a federal officer, the federal defense issue is moot.[6]

## V. CONCLUSION

The defendants fail to meet their burden to demonstrate that federal officer jurisdiction is proper. Therefore, the Court **GRANTS** the plaintiff's motion to remand (dkt. no. 14) and **REMANDS** this case to the Circuit Court of Harrison County, West Virginia for further proceedings. The Court further **ORDERS** that the case be stricken from the docket.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

DATED: May ___17___, 2005.

IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE

---

[6] The Court nonetheless observes that, in the Arness case, Boeing asserted the same federal defense (i.e., the government contractor defense) that DuPont asserts in this case. 997 F. Supp at 1272. In Arness, the district court determined that Boeing's defense was "colorable" without considering its likelihood of success. Id. at 1273; see Willingham v. Morgan, 395 U.S. 402, 407 (1969).